UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BELUCA VENTURES LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EINRIDE AKTIEBOLAG, et al., <br><br> Defendants. | Case No. 21-cv-06992-WHO <br><br> **ORDER DENYING MOTION TO COMPEL** <br><br> Re: Dkt. Nos. 3, 17, 18 |

Plaintiffs Beluca Ventures LLC ("Beluca") and Christian Lagerling, the owner and sole member of Beluca, filed this suit in Marin County Superior Court seeking to collect compensation from defendants Einride Aktiebolag ("Einride AB") and Einride U.S. Inc. related to Beluca's fundraising for defendants. Compl. [Dkt. No. 1-1], ¶¶ 1, 10-13. Defendants removed the case to federal court and now move to compel arbitration. Dkt. Nos. 1, 17. Because the alleged oral agreement does not arise out of or in connection to the Consultancy Agreement with the arbitration provision defendants seek to enforce, the motion to compel arbitration is DENIED.

**BACKGROUND**

The parties have entered into a series of written agreements over time regarding Lagerling's role as a shareholder of defendants or as a fundraiser for defendants. The first was a Consultancy Agreement in May 2019 ("May 2019 Consultancy Agreement"). Dkt. No. 22-1. That Agreement identified the services Beluca would provide in connection with defendants' Series A equity financing and the specific renumeration to be paid to Beluca for its Series A efforts. *Id*. §§ 1.1 – 3.1 (5.8% of gross proceeds). The May 2019 Consultancy Agreement contained an arbitration clause stating that "[a]ny dispute, controversy or claim arising out of or in connection with the Consultancy Agreement or the breach, termination or invalidity thereof, shall be settled by arbitration." *Id.* § 5.2.

On June 5, 2019, all the then-current shareholders of Einride (including Lagerling) and two lead investors of Einride entered into a Shareholders' Agreement. Dkt. No. 18-3. The Shareholder Agreement stipulated that any agreement that Einride entered into with a shareholder or any entity controlled by a shareholder would require prior written approval of each lead investor. *Id.* § 4.6(d).

On November 6, 2019, Beluca and Einride AB entered into a second consultancy agreement ("November 2019 Consultancy Agreement"), under which Beluca was retained to provide services in connection with a convertible debt financing ("CDF") round to provide "bridge" financing "in between the completed Series A financing round and a future Series B financing round." November 2019 Consultancy Agreement [Dkt. No. 3-3], § 1.1. Sections 1.1 through 1.5 of the November 2019 Agreement provide:

> 1.1 The Company intends to carry out a convertible debt financing (the "CDF") to secure the Company's financial needs in between the completed Series A financing round and a future Series B financing round ("Series A Equity Financing" and "Series B Equity Financing" respectively).
>
> 1.2 The CDF is intended to be carried out by way of issuing convertible debt in the Company which will be converted into shares in the Company as part of the Series B Equity Financing, at a conversion price best possible with a floor equaling the price per share in the Series A Equity Financing. The final conversion terms as well as other terms and conditions for the CDF, including targeted amount and time frame, will be determined by the board of directors of the Company in conjunction with a board meeting 29 November, 2019.
>
> 1.3 Furthermore, the CDF may be carried out as one or several private placements of convertibles (or any other financial instrument which the board of directors decide) and may be followed by subsequent repair issues (the "Offering"). The choice of investors, amounts and timing for final closing of the Offering will be decided by the board of directors at its sole discretion.
>
> 1.4 Whereas the CDF is the working instrument of the Offering, it is possible that specific investors will require other specific instruments for making an investment, which could include other debt or equity structures, and if the board of directors of the Company/owners of the Company accepts any such structures, they should be part of this Agreement including with regards to Remuneration, see section 3 below.
>
> 1.5 The Consulting Company has been engaged by the Company to provide services in connection with the CDF which shall include

2

>to assist the Company in the Offering. Among other things the Consulting Company will provide investor leads and negotiation support in connection with the Offering.

*Id.* §§ 1.1, 1.5.

Beluca's renumeration materially changed from the May 2019 Consultancy Agreement. It included a monthly retainer, a 2% success fee of the gross proceeds, as well as a 0.5% discretionary fee. *Id.* §§ 3.1-3.4. The November 2019 Consultancy Agreement provided that "[a]mendments and additions to this Agreement shall be in writing and signed by a representative, authorized for this purpose, of each party in order to be valid." *Id.* § 9.2.[1] It also contained an arbitration provision, providing that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce." *Id.* § 10.1.

On October 6, 2020, Beluca and Einride AB executed an amendment to the November 2019 Consultancy Agreement ("October 2020 Amendment"). Dkt. No. 3-3 at ECF pgs 8-10. At that time, Einride had received more than 7.8 million euros in gross proceeds, yet the amendment stipulated that parties agreed no success fee or discretionary fee would be paid in relation to that amount. *Id.* at 8. The Amendment also modified the renumeration provision by narrowing what would count as gross proceeds. *Id.* Under the amended provision, only the convertibles (or any other financial instrument) sold to "reserved investors" would be counted. *Id.* The Amendment has an appendix which contains a list of reserved investors. *Id.* at 10. The Amendment was in writing and signed by both parties. *Id.* at 9.

According to plaintiffs, on December 15, 2020, the parties entered into a new, separate oral agreement that is the subject of this action. Compl. ¶¶ 4-6. Plaintiffs contend that Einride was having significant difficulty soliciting investment for a Series B equity financing round. Einride's CEO reached out via telephone and asked Lagerling and Beluca to perform different services for Einride's Series B equity fundraising efforts under terms materially different from the terms of the

---

[1] Lagerling agreed to be jointly and severally liable for obligations under the November 2019 Consultancy Agreement, including to be bound by the arbitration provision. November 2019 Consultancy Agreement at 6.

3

1  November 2019 Consultancy Agreement as amended. *Id*. ¶ 5. For example, for its efforts in the
2  Series B round, the renumeration for Beluca would be 2.5% for a lead investor's capital, 1% for
3  others, and a monthly retainer. *Id*. ¶ 5. In support of the opposition to the motion to compel,
4  Lagerling declares that he "separately negotiated" the materially different scope of his duties to
5  defendants for Series B fundraising as well as the materially different terms of Beluca's
6  compensation for those efforts that were "significantly lower than the industry standard" and
7  lower than the levels of compensation in both the May 2019 Consultancy Agreement for Series A
8  equity financing and the November 2019 Consultancy Amendment for bridge financing.
9  Declaration of Christian Lagerling ("Lagerling Decl.") [Dkt. No. 21-1.] ¶ 9. According to
10 Lagerling, the December 2020 oral agreement did not provide for arbitration, nor did the parties
11 discuss any choice of law or forum selection clause. *Id*. ¶ 10.

12     Lagerling asserts that he raised the idea of memorializing this Series B-related agreement
13 in writing, but was told by Einride that time was of the essence and that proceeding on an oral
14 agreement basis would be fine because everyone was in agreement. *Id*. ¶ 12. Because of the
15 parties' close working relationship, Lagerling agreed on behalf of Beluca and started work on the
16 Series B financing. *Id*.

17     In moving to compel, the defendants assert that the alleged oral agreement never existed,
18 but even if it had it would be unenforceable. Mot. at 1. However, defendants do not dispute that
19 the phone call between Einride and Lagerling related to Series B financing took place on
20 December 15, 2020. Mot. at 12. Nor do defendants provide any evidence by declaration or
21 otherwise to counter Lagerling's claim that in that call the parties discussed terms for Series B
22 fundraising that were materially different from the terms covering Beluca's compensation for the
23 Series A or bridge fundraising efforts.

24     Instead, in support of their motion to compel, defendants attach emails sent between the
25 parties on December 15, 2020 and February 5, 2021. Dkt. No. 18-4. The first December 15, 2020
26 email (at 2:55 p.m.) discusses Lagerling's request to receive a signed copy of the October 2020
27 Amendment. The second December 15, 2020 email (at 3:33 p.m.) summarizes Lagerling's belief
28 concerning the parties' negotiations regarding Series B financing: Lagerling states,"I have my

4

1  contract that covers" the "closing of Series B financing" and requests that the parties finalize the
2  terms of his lead role and incentives and add names to the lists of clients (presumably existing in
3  the November 2019 Consultancy Agreement and its October 2020 Amendment) on a "case by
4  case, as we go along/trusting that we continue to find fair solutions." *Id*. at ECF pg. 4 of 8.  The
5  February 5, 2021 email is a follow up to the first December email, asking a representative of
6  Einride to "fix this" (referring to Lagerling's concern that he never received a signed copy of the
7  2020 Amendment) and a request to add another party to the Appendix to the October 2020
8  Amendment.  *Id*. at ECF pg. 6 of 8.[2]

9  Einride raised $110 million in its Series B financing round that officially closed in May
10 2021.  Compl. ¶ 6.  Lagerling asserts that on May 6, 2021, he sent a rough calculation of his
11 earned compensation pursuant to the alleged December 2020 oral agreement to Einride via
12 "message" and Einride's CEO "ratified this calculation according to the agreement and
13 affirmatively confirmed via written response and indicated that Beluca should send an invoice
14 reflecting those amounts."  Compl. ¶ 8.  Yet Einride refused to pay.  *Id*. ¶ 9.

15 According to defendants, the 2019 Consultancy Agreement was terminated on May 25,
16 2021.  Dkt. No. 17-2 at 2.  Einride sent a letter to Beluca confirming that termination on June 28,
17 2021.  *Id.*

18 **LEGAL STANDARD**

19 The Federal Arbitration Act ("FAA") governs motions to compel arbitration.  9 U.S.C. §§

---

[2] Defendants filed an administrative motion seeking to seal excerpts of the November 2019 Consultancy Agreement (as amended).  Dkt. No. 3.  That motion is GRANTED in part.  Defendants may continue to seal the tax reference numbers and the identification of the investors in the Appendix.  Defendants have not shown compelling justifications to seal the "background" provisions regarding the scope of the Agreement (cited herein) and defense counsel cited the contents of Section 2.2 of the Amendment (regarding gross proceeds) during the public court hearing.  Defendants also seek to file under seal in full the parties Shareholder Agreement and the full contents of the December 2020 and February 2021 emails.  Dkt. No. 18.  That motion is DENIED as overbroad and not narrowly tailored.  *See* Civ. L.R. 79-5(c)(3).  If there are specific pieces of information in those documents that meet the compelling justifications standard for sealing (*e.g*., identification of non-public investors or shareholders), defendants should submit a renewed narrowly tailored motion to seal identifying the particular pieces of information within these documents that they contend merit sealing.  That revised motion, supported by a declaration from a person with knowledge, should be filed within ten (10) days of the date of this Order.  If no revised motion is filed by that date, Dkt. Nos. 18-3 and 18-4 will be unsealed.

1 *et seq*. The FAA "reflect[s] both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The court's role is to decide: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The party seeking to compel arbitration must prove both counts by a preponderance of the evidence. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). The scope of an arbitration agreement is governed by federal substantive law. *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id*. at 1131.

**DISCUSSION**

The only question I have to answer is whether plaintiffs' dispute with defendants arises "out of or in connection with" the November 2019 Consultancy Agreement. November 2019 Consultancy Agreement § 10.1. It does not.

"When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Levi Strauss & Co. v. Aqua Dynamics Sys.*, 15-cv-04718-WHO, 2016 U.S. Dist. LEXIS 144288, *12 (N.D. Cal. Oct. 18, 2016). Here, defendants provide no evidence disputing plaintiffs' version of the phone call on December 15, 2020, during which defendants' representative allegedly discussed plaintiffs providing fundraising services related to Series B financing. Nor do they dispute that during that phone call the parties discussed terms for remuneration for Beluca's services related to Series B financing that were materially different from the terms covering Beluca's compensation for its separate efforts on the Series A or the CDF bridge financing offerings. While defendants contest whether the parties reached an enforceable oral agreement, contending that the parties' Shareholder Agreement required all agreements to be in writing, that is a merits issue that does not

6

need to be resolved in order to determine whether arbitration should be compelled.

The undisputed evidence supports plaintiffs' position that the current dispute – compensation for fundraising efforts taken in support of defendants' Series B round – does not arise out of in connection with the November 2019 Consultancy Agreement. Plaintiffs' prior fundraising efforts were covered by separate agreements containing materially different terms (May 2019 Consultancy Agreement, November 2019 Consultancy Agreement). Under the terms of those prior agreements, any material amendments had to be in writing. *See* October 2020 Amendment. The Series B fundraising was never covered by the express terms of the parties' prior agreements.

Defendants contend that "equity" fundraising of the sort plaintiffs allege they provided for the Series B round was contemplated in the November 2019 Consultancy Agreement and, therefore, any equity fundraising undertaken by plaintiffs "arises out of or in connection to" the November 2019 Consultancy Agreement. Reply (Dkt. No. 22) at 3-6. That argument ignores that the express scope of the November 2019 Consultancy Agreement is limited to bridge financing efforts, the "offering" of which was to consist primarily of convertible debt instruments but possibly equity investments as well. November 2019 Consultancy Agreement, §§ 1.1-1.4.

The "Background" section of the November 2019 Consultancy Agreement specifies that Einride "intends to carry out the convertible debt financing to secure the Company's financial needs in between the completed Series A financing round and a future Series B financing round" and that Beluca "has been engaged by the Company to provide services in connection with the CDF which shall include to assist the Company in the Offering." *Id.* §§ 1.1, 1.5. These provisions delineate the scope of this agreement – the parties' rights and obligations associated with the bridge offering. In contrast, the current dispute arises from the alleged failure on the defendants' part to pay plaintiffs' renumeration based on their assistance with Series B equity financing. Defendants do not submit any evidence – by declaration or otherwise – that the compensation plaintiffs seek through this suit was related to the bridge financing efforts. Defendants' motion is

completely silent about the express scope of that agreement to provide bridge financing.[3]

The course of dealing between these two sophisticated parties likewise supports plaintiffs. The history of entering into separate agreements with different terms for each of the different phases of financing – evidence not addressed by defendants – refutes defendants' contention that the November 2019 Consultancy Agreement could be stretched to cover Series B financing. Specifically, the parties entered into the May 2019 Consultancy Agreement for Beluca's involvement in the defendants' Series A financing and November 2019 Consultancy Agreement (as amended) for the bridge financing. Therefore, having a separate agreement to cover Series B financing is in alignment with their course of dealing. That their alleged agreement was not executed in writing and that the November 2019 Consultancy Agreement was never amended in writing to cover these new efforts and materially different terms of remuneration does not bring plaintiffs' Series B fundraising efforts under the limited-in-scope November 2019 Consultancy Agreement.

Based on plaintiffs' well-pleaded allegations, the terms for remuneration under the alleged December 2020 oral agreement (Comp. ¶ 5) are materially different from those under the May 2019 Consultancy Agreement or the November 2019 Consultancy Agreement as amended. Construing the facts and reasonable inferences in a light most favorable to the plaintiffs, I find that the claims for remuneration here – whether or not the December 2020 oral agreement is enforceable – do not arise from or in connection with the November 2019 Consultancy Agreement.

The defendants assert that any amendment or addition to the November 2019 Consultancy Agreement has to be in writing, and that would make any alleged oral agreement invalid. Mot. at 8. But the enforceability of the alleged December 2020 oral agreement is a merits issue. There is no evidence that Series B fundraising (that consistent with the parties' course of conduct would be

---

[3] At oral argument, defendants asserted that Sections 1.3 through 1.5 of November 2019 Consultancy Agreement contemplate both that equity investments and "repair issues" may be part of Offering covered by the November 2019 Agreement. Those investment vehicles, however, were part of the bridge financing Offering that was defined by the Agreement as separate from any "future Series B" financing round. *Id*. § 1.1.

1  subject to a separate agreement with materially different terms) was covered by the existing
2  November 2019 Consultancy Agreement (as amended).  Also, defendants' arguments regarding
3  when the November 2019 Consultancy Agreement (as amended) was formally terminated are
4  irrelevant to the question at hand because plaintiffs disclaim any effort in this case to seek
5  compensation for the CDF bridge financing.  Mot. at 10-11.

6  Defendants' reliance on emails sent between the parties on December 15, 2020 and
7  February 5, 2021 do not help them.  They rely primarily on the December 15, 2020 email (at 3:33
8  p.m.) where Lagerling states that "[s]ummarizing next step, objectives, processes, etc., here: 1.
9  Closing of B-round financing (Christian leads) . . . 2. Progress asset . . . I have my contract that
10 covers 1, and I would be happy to take the lead to close it all."  They argue that this indicates that
11 Lagerling believed the November 2019 Consultancy Agreement remained in effect at that time
12 and that he wanted to "tweak its terms—not to replace the Consultancy Agreement."  Mot. at 12.
13 However, even if Lagerling thought the parties were going to use the November 2019 Consultancy
14 Agreement (as amended) as a basis for a new agreement for Series B financing, no written
15 agreement or amendment in writing was ever executed.  What remains is the limited-in-scope
16 November 2019 Consultancy Agreement covering bridge financing that both sides agree could
17 only be amended in writing.

18 The cases on which defendants rely do not support their argument.  In *ATSA of California,*
19 *Inc. v. Continental Insurance Co*., the written agreement that contained the arbitration provision
20 required ATSA to provide a prefabricated factory to a company, and the dispute arose out of an
21 oral agreement by ATSA to repair components that were damaged during shipping.  702 F.2d 172,
22 175 (9th Cir. 1983).  The Ninth Circuit determined that the dispute over the repair "is related to
23 their written agreement" because of the direct connection to the underlying written agreement.
24 Without the written agreement, there would have been no need to make the oral repair agreement.
25 The course of dealings here, however, is significantly different and demonstrates a series of
26 separate agreements covering distinct sets of services under materially different terms.

27 In *Simula, Inc. v. Autoliv, Inc*., the parties signed nondisclosure agreements in 1993 and a
28 letter of intent in 1994 that did not contain arbitration clauses.  175 F.3d 716 (9th Cir. 1999).  In

9

1995, they entered into a series of written agreements that contained an arbitration clause: 1) a Joint Development and Cooperation Agreement; (2) a Licensing Agreement; and (3) a Frame Supply Agreement (collectively the "1995 Agreement"). *Id.* at 718. The plaintiff then brought Lanham Act claims, among others, and contended those claims were not arbitrable because they were tort claims relating to conduct occurring prior to the 1995 Agreement that contained an arbitration clause. *Id.* at 723. It argued that the claims should be governed by the parties' previous agreements that did not contain a commitment to arbitrate. *Id.* The Ninth Circuit found that the 1995 Agreement "effectively subsumed the prior contracts" because the 1995 Agreement constituted "the entire understanding and agreement" between the parties and "[a]ny other previous negotiations, discussions and written or oral agreements between the parties . . . are superseded." *Id.* In essence, the 1993 nondisclosure agreement and January 1994 letter of intent were incorporated into the 1995 Agreement that contained an arbitration clause. The Ninth Circuit further determined that the entire business relationship between the parties was dependent, in part, on the rights and obligations under the nondisclosure agreements and that they were subsumed by the 1995 Agreement.[4] *Id.* at 725. That is not similar to the facts here: the oral agreement covering plaintiffs' assistance in Series B financing was not incorporated into the November 2019 Consultancy Agreement because it covered a different phase of financing with materially different terms and no written amendment to the November 2019 Consultancy Agreement covering Series B financing was ever effectuated.

In *Maxit Designs, Inc. v. Coville, Inc*., the parties had an original oral agreement regarding the sale of fabrics at the "lowest price" and then entered into a series of sales contacts (some signed and some unsigned). 2006 U.S. Dist. LEXIS 68838, *1-2 (E.D. Cal. Sept. 25, 2006). When plaintiff sued, it argued that the dispute "centers only around a breach of the original oral

---

[4] The defendants also mischaracterize *Simula*. The defendants contend that "[t]he Ninth Circuit has held that when 'it is unlikely that' the parties would have done business together without the agreement containing an arbitration provision, claims arising out of their business relationship are subject to the presumption of arbitration." Mot. at 8 (relying on *Simula*). The Ninth Circuit actually said, "it is unlikely that without the disclosure agreements," the parties would have done business together, providing a justification for incorporating the disclosure agreements into the 1995 Agreement. *Simula*, 175 F.3d at 725.

agreement" to sell at the lowest price and not of any subsequent sales contract (that contained arbitration clauses). The court concluded that the claims asserted (misrepresentation/fraud in the inducement and/or fraud, unfair business practices, and breach of contract), although arising under the oral "lowest price" promise, were obviously related to the written sales contracts under which the fabric was delivered and that the arbitration clause applied. Given the scope of the written contracts into which the parties have entered here, *Maxit* is inapposite.[5]

## CONCLUSION

Given the scope of the November 2019 Consultancy Agreement (as amended), the course of conduct between the parties, and the allegations in the Complaint, the Motion to Compel Arbitration is DENIED.

**IT IS SO ORDERED.**

Dated: November 1, 2021



William H. Orrick
United States District Judge

---

[5] Defendants also rely on a series of cases holding that parties cannot avoid arbitration by not mentioning an arbitration agreement in their complaint or by asserting that an oral agreement supersedes a written agreement. *See, e.g., In re Pacific Fertility Center Litigation*, 814 F. App'x. 206 (9th Cir. 2015) (compelling tort claims to arbitration even though complaint did not mention written agreement). Those authorities do not resolve the issue before me. Similarly, the well-established policy that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, a policy that applies with special force to disputes arising from international commerce, Mot. at 5-6, does not compel a different result where there are no doubts as to the scope of the arbitrable issue.

11